**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ERIC MICHAEL CLARK, *Petitioner-Appellant*, | No. 12-15601 |
| v. | D.C. No. 3:09-cv-08006-JAT |
| JAMES ARNOLD; TERRY L. GODDARD; CHARLES L. RYAN, *Respondents-Appellees*. | OPINION |

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, Senior District Judge, Presiding

Argued and Submitted
January 13, 2014—San Francisco, California

Filed October 8, 2014

Before: J. Clifford Wallace and Jay S. Bybee, Circuit
Judges, and James C. Mahan, District Judge.[*]

Opinion by Judge Bybee

---

[*] The Honorable James C. Mahan, District Judge for the U.S. District Court for the District of Nevada, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's judgment denying Eric Michael Clark's 28 U.S.C. § 2254 habeas corpus petition challenging a conviction of murdering a law enforcement officer in the line of duty.

Clark argued his trial counsel was ineffective under *Strickland v. Washington* for not preserving "observation evidence" that could negate the mens rea element of the crime and for failing to request a reevaluation of his competency during trial. He also argued that his appellate counsel was ineffective for failing to raise those issues on appeal.

In light of the "doubly deferential" standard afforded to *Strickland* claims brought under § 2254, the panel concluded that it was not contrary to, nor an unreasonable application of, *Strickland* for the state court to determine that Clark's trial counsel did not provide ineffective assistance by failing to preserve explicitly the issue of observation evidence or by failing to request a reevaluation of Clark's competency. The panel held that Clark's claim of ineffective appellate counsel is procedurally defaulted.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Carla G. Ryan (argued), Law Office of Carla G. Ryan, Tucson, Arizona, for Petitioner-Appellant.

Michael T. O'Toole (argued), Assistant Attorney General; Thomas C. Horne, Attorney General; Kent E. Cattani, Division Chief Counsel; Joseph T. Maziarz, Section Chief Counsel, Phoenix, Arizona, for Respondents-Appellees.

**OPINION**

BYBEE, Circuit Judge:

Arizona state prisoner Eric Michael Clark appeals from the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition challenging his conviction of murdering a law enforcement officer in the line of duty. Clark argues his trial counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for not preserving "observation evidence" that could negate the mens rea element of the crime and for failing to request a reevaluation of his competency during trial. He also argues that his appellate counsel was ineffective for failing to raise those issues on appeal.

In light of the "doubly deferential" standard afforded to *Strickland* claims brought under § 2254, *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009), we conclude that it was not contrary to, nor an unreasonable application of, *Strickland* for the state court to determine that Clark's trial counsel did not provide ineffective assistance by failing to preserve explicitly the issue of observation evidence or by failing to request a reevaluation of Clark's competency. We

hold that Clark's claim of ineffective appellate counsel is procedurally defaulted. Accordingly, we affirm the judgment of the district court denying Clark's habeas petition.

## I. BACKGROUND

A. *Offense and Trial*

The instant appeal is the latest chapter in this case's long and complex history. The facts of the underlying crime are straightforward. As described by the U.S. Supreme Court in Clark's direct appeal:

> In the early hours of June 21, 2000, Officer Jeffrey Moritz of the Flagstaff Police responded in uniform to complaints that a pickup truck with loud music blaring was circling a residential block. When he located the truck, the officer turned on the emergency lights and siren of his marked patrol car, which prompted petitioner Eric Clark, the truck's driver (then 17), to pull over. Officer Moritz got out of the patrol car and told Clark to stay where he was. Less than a minute later, Clark shot the officer, who died soon after but not before calling the police dispatcher for help. Clark ran away on foot but was arrested later that day with gunpowder residue on his hands; the gun that killed the officer was found nearby, stuffed into a knit cap.

*Clark v. Arizona*, 548 U.S. 735, 743 (2006).

Clark was charged with first-degree murder for intentionally or knowingly killing a law enforcement officer in the line of duty under Ariz. Rev. Stat. Ann. § 13-1105(A)(3).[1] Independent psychological experts appointed by the court deemed him incompetent to stand trial. The parties subsequently stipulated to Clark's incompetence.

1. Competency

Clark underwent treatment to restore competency at a state hospital beginning in April 2001. In October 2001, Arizona State Hospital evaluator Edward Jasinski, Ph.D., concluded "to a reasonable degree of psychological certainty that[] Mr. Clark is competent to stand trial." He deemed any lack of cooperation between Clark and his evaluators "volitional." Court-appointed doctors came to similar conclusions. M.B. Kassell, M.D., wrote in November 2001 that Clark was "at this time . . . quite [c]ompetent." John P. DiBacco, Ph.D., wrote that at that time Clark was "competent to stand trial and, more specifically, can assist his attorney in his own defense as well as understand the process to the extent necessary."

Competency hearings followed in the summer of 2002. Drs. DiBacco, Kassell, and Jasinski testified that Clark was competent and that any failure to cooperate with his attorney was volitional. Clark's expert, Susan Parrish, Ph.D., disagreed with this finding, writing that Clark "can't fully appreciate the situation," and that any failure to work with his

---

[1] Section 13–1105(A)(3) provides that "[a] person commits first degree murder if . . . [i]ntending or knowing that the person's conduct will cause death to a law enforcement officer, the person causes the death of a law enforcement officer who is in the line of duty."

lawyers "is not volitional." The court considered all the
evidence and ordered Clark readmitted to the hospital in
September 2002 and ordered periodic reports from his
doctors. Drs. Kassell and Jasinski submitted further reports
attesting to Clark's competence.[2]  Barry Morenz, M.D.,
another expert retained by Clark, provided an assessment in
April 2003, concluding that Clark "does have some cognitive
awareness of his current legal predicament" and he "could be
considered marginally competent to stand trial but his
competency would have to be considered qualified." He
noted that injections of an antipsychotic drug called Haldol
"are probably helping him, at least to some degree . . . ," but
it was "not clear that Mr. Clark can rationally assist his
attorney in his own defense since Mr. Clark has yet to have
a rational conversation with his attorney about his case. To
conclude that Mr. Clark is clearly competent would imply
that Mr. Clark is malingering," which Dr. Morenz called
"possible" but "not likely."

In May 2003, after reviewing "the records submitted by
Dr. Kassel, Dr. DiBacco, Dr. Morenz, and Dr. Jasinski and
all other information," the court concluded that Clark was
"competent to stand [t]rial, understands the proceedings, and
if he chooses, can assist his attorney in his defense. The
Defendant's status, at this time, is one of volition, as opposed

---

[2] Jasinski noted that Clark "ask[ed] questions about civil commitments,
GEI [guilty except for insanity], and prison sentences" and "wanted to
know where you would have to serve the longest sentence and if you were
under a civil commitment, would your charges be dropped." Clark later
told Jasinski: "I'm charged with murdering a police officer, but I am
innocent." Jasinski wrote Clark "does have a good understanding of his
legal situation, does have an awareness of various legal options in this
case, and in fact is weighting various options."

to any inability." The bench trial began on August 5, 2003, and lasted eleven days.

On the seventh day of the trial, Clark's attorney, Byron Middlebrook, told the judge that he and co-counsel David Goldberg "have some concerns that [Clark] may not be following what's occurring in court" and said that there was "some concern about making sure that [he] gets medicated and stuff. And I will be the first to admit that we have kind of let that drop off. . . . [W]e probably need to get him medicated. We're getting a little concerned that he's not following." The court said it would contact the jail to make sure it was aware of a court order requiring that Clark be given his medication, specifically Haldol, even involuntarily. This colloquy is the extent of any concerns raised during trial about Clark's mental health.

### 2. The Insanity Defense Under Arizona Law

Arizona's traditional approach to the insanity defense was adapted from *M'Naghten's Case*, (1843) 8 Eng. Rep. 718 (Q.B.), the single most influential articulation of the common law insanity defense.[3] In that case, in 1843, Daniel

---

[3] *See* Renée Melançon, Note, *Arizona's Insane Response to Insanity*, 40 Ariz. L. Rev. 287, 294 (1998) [hereinafter *Response to Insanity*] ("Arizona's original insanity defense statute was basically the M'Naghten test."); *see also Durham v. United States*, 214 F.2d 862, 869 (D.C. Cir. 1954), *abrogated on other grounds by United States v. Brawner*, 471 F.2d 969 (D.C. Cir. 1972) ("[T]he House of Lords in the famous M'Naghten case restated what had become the accepted 'right-wrong' test in a form which has since been followed, not only in England but in most American jurisdictions as an exclusive test of criminal responsibility.") (footnotes omitted); Wayne R. LaFave, 1 Subst. Crim. L. § 7.2 (2d ed.) ("In a majority of the jurisdictions in this country, what is most often referred to

M'Naghten shot and killed Edward Drummond, the secretary to Prime Minister Sir Robert Peel, believing that Drummond was Peel. *See id.* at 719; Fradella, *From Insanity*, at 15. M'Naghten was under the delusion that Peel was persecuting him, and he was acquitted of murder on the ground of insanity. Subsequently, the House of Lords put several questions relating to insanity to English judges. *See M'Naghten*, 8 Eng. Rep. at 720. The judges' answers became known as the M'Naghten Rules, the most important of which provided:

> [T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.

*Id.* at 722.

---

as the M'Naghten rule has long been accepted as the test to be applied for the defense of insanity."); Henry F. Fradella, *From Insanity to Beyond Diminished Capacity: Mental Illness and Criminal Excuse in the Post*-Clark *Era*, 18 U. Fla. J.L. & Pub. Pol'y 7, 15 (2007) [hereinafter *From Insanity*] ("In 1843, the M'Naghten case set forth a legal standard for insanity that many U.S. jurisdictions still use today.") (footnotes omitted); *cf. Clark*, 548 U.S. at 749 ("Even a cursory examination of the traditional Anglo-American approaches to insanity reveals significant differences among them, with four traditional strains variously combined to yield a diversity of American standards[,]" although the first two strains "emanate from the alternatives stated in the *M'Naghten* rule.").

*M'Naghten* essentially established a two pronged insanity defense. The first, the cognitive incapacity prong, asks whether a mental defect left a defendant at the time of the act unable to understand what he was doing—to form the requisite mens rea of the crime charged. *See Clark*, 548 U.S. at 747; Fradella, *From Insanity*, at 18 ("The cognitive incapacity part of the test relieves the defendant of liability when the defendant is incapable of forming mens rea."). If, for example, "in crushing the skull of a human being with an iron bar, [a person] believed that he was smashing a glass jar," he would be deemed insane under the cognitive incapacity prong of *M'Naghten*. 2 Wharton's Crim. L. § 101 (15th ed.); *see also* Fradella, *From Insanity*, at 18 ("For example, if a man strangled another person believing that he was squeezing the juice out of a lemon, he did not understand the nature and quality of his act.").

The second prong, called the moral incapacity prong, asks whether a mental disease or defect left the defendant unable to appreciate the wrongfulness of his act. *See Clark*, 548 U.S. at 747. In that circumstance, the defendant "knew what he was doing; he knew that he was crushing the skull of a human being with an iron bar. However, because of mental disease, he did not know that what he was doing was wrong. He believed, for example, that he was carrying out a command from God." 2 Wharton's Crim. L. § 101. In that example, the defendant would have satisfied the cognitive capacity prong—because he had the mens rea for he knew he was crushing a human skull with intent to kill—but he could be adjudged insane because he did not think his doing so was wrong given the context. *See* Fradella, *From Insanity*, at 18 (describing this prong of *M'Naghten* as "usually at the crux of an insanity defense").

Until the early 1990s, Arizona "uniformly adhered" to "the Rule of M'Naghten's Case as the test for criminal insanity." *State v. Schantz*, 403 P.2d 521, 525 (1965) (citing cases from 1921). When Arizona "first codified an insanity rule [in 1978] it adopted the full *M'Naghten* statement." *Clark*, 548 U.S. at 747. The 1978 law read in relevant part:

> A person is not responsible for criminal conduct if at the time of such conduct the person was suffering from such a mental disease or defect as not to know the nature and quality of the act or, if such person did know, that such person did not know that what he was doing was wrong.

*Id.* at 747–48 (quoting Ariz. Rev. Stat. Ann. § 13–502 (West 1978)).

But in 1993, after a defendant in a highly publicized murder trial was found not guilty by reason of insanity and was later released, Arizona's legislature changed the insanity defense and adopted a much more restrictive version of the test. Melançon, *Response to Insanity*, at 290. The new law did not include a "cognitive incapacity" provision; it left only the second prong of the *M'Naghten* test, the so-called moral incapacity test:

> A person may be found guilty except insane if at the time of the commission of the criminal act the person was afflicted with a mental disease or defect of such severity that the person did not know the criminal act was wrong. A mental disease or defect constituting legal insanity is an affirmative

defense.  Mental disease or defect does not include disorders that result from acute voluntary intoxication or withdrawal from alcohol or drugs, character defects, psychosexual disorders or impulse control disorders.  Conditions that do not constitute legal insanity include but are not limited to momentary, temporary conditions arising from the pressure of the circumstances, moral decadence, depravity or passion growing out of anger, jealousy, revenge, hatred or other motives in a person who does not suffer from a mental disease or defect or an abnormality that is manifested only by criminal conduct.

Ariz. Rev. Stat. Ann. § 13-502(A).

In *State v. Mott*, 931 P.2d 1046 (Ariz. 1997), the Arizona Supreme Court addressed what kind of evidence could be admitted at trial to negate specific intent under the new law. *Mott* concerned expert evidence on battered woman syndrome ("BWS").  931 P.2d at 1049.  The defendant was convicted of two counts of child abuse and first-degree murder and sought to introduce testimony from an expert on BWS to show that the defendant's mental capacity negated the specific intent necessary to "knowingly or intentionally" commit child abuse.  *Id.*  The trial court denied the admission of such evidence, but the appellate court reversed.  The Arizona Supreme Court reversed again.  *Id.*  Reviewing the Arizona insanity defense statute, the court concluded that the legislature's rejection of a diminished capacity defense (the cognitive prong) was also a bar on "evidence of a defendant's mental disorder short of insanity either as an affirmative

defense or to negate the *mens rea* element of a crime." *Id.* at 1051.

The BWS expert's "testimony was offered to demonstrate that defendant's mental incapacity negated specific intent." *Id.* at 1054. The court held it was not admissible for that purpose, and "did not meet the standards of the one test for criminal responsibility—the *M'Naghten* test—that Arizona does follow"—the moral incapacity prong of the test. *Id.* at 1054–55. "Furthermore, if [the court] adopted the defendant's position and allowed expert testimony such as this to negate specific intent, the result would be . . . to compel juries to 'release[ ] upon society many dangerous criminals who obviously should be placed under confinement.'" *Id.* at 1055 (alteration in original) (citation omitted).[4]

### 3.  The State Trial

Clark was tried without a jury. The revised version of the insanity defense, as interpreted by *Mott*, was the operative law during Clark's bench trial. After the state presented its case, Clark moved for a directed judgment of acquittal claiming that there was insufficient evidence that he knew the

---

[4] Mott later filed a habeas petition that the Arizona district court granted in an unpublished opinion. *Mott v. Stewart*, 98-CV-239, 2002 WL 31017646 (D. Ariz. Aug. 30, 2002) (unpublished). The court concluded that "[t]he exclusion of evidence of mental disease or defect offered to negate the specific intent element of an offense or to establish an alternative explanation for a defendant's conduct is disproportionate to the purposes stated by the court that it was designed to serve." *Id.* at *6. Clark's trial court did not rely on Mott's habeas proceeding when it construed *Mott*, concluding that an unpublished federal opinion was not "the law of the land of the State of Arizona."

officer whom he shot "was actually a police officer and that he was actually intending to kill a police officer," and not an alien. Clark had told others that he believed that aliens had invaded Flagstaff and were impersonating government agents. In response, the state introduced evidence that the officer displayed all the indicia of the police: he drove a squad car, turned on his lights and sirens, and wore a uniform, and that Clark pulled over as ordered. The court denied the motion.

During trial, Clark claimed mental illness and sought to introduce evidence of such illness for two purposes. First, Clark raised the affirmative defense of insanity under Arizona law—that "at the time of the commission of the criminal act [he] was afflicted with a mental disease or defect of such severity that [he] did not know the criminal act was wrong." Ariz. Rev. Stat. Ann. § 13–502(A). Second, he sought to rebut the prosecution's evidence of the requisite mens rea under the first-degree murder statute, that he had acted intentionally or knowingly to kill a law enforcement officer. *See Clark*, 548 U.S. at 744.

On the second ground, the trial court interpreted *Mott* as barring evidence of insanity to dispute mens rea, but permitted the evidence to be admitted. The court stated that "after reading all [of] the Mott case," and recognizing that "all" of the defense counsel's evidence "has to do with the insanity [claim but] could also arguably be made along the lines of the Mott issues as to form and intent and [Clark's] capacity for intent," it would "let [counsel] go ahead and get all that stuff in [the record] because it goes to the insanity issue and because we're not in front of a jury." The court added that "[a]t the end, I'll let [counsel] make an offer of proof as to the intent, the Mott issues, but I still think the

[Arizona] supreme court decision [in *Mott*] is the law of the land in this state." "I will certainly allow you to preserve the issue, you can argue or not argue, but you can make an offer of proof at the conclusion of the case, but I don't think it's the law of the land at this point."

Clark presented significant evidence of his mental state and the nature and effect of his delusions. Witnesses included a psychiatrist as well as "classmates, school officials, and his family [who] describ[ed] his increasingly bizarre behavior over the year before the shooting." *Clark*, 548 U.S. at 745.

> Witnesses testified, for example, that paranoid delusions led Clark to rig a fishing line with beads and wind chimes at home to alert him to intrusion by invaders, and to keep a bird in his automobile to warn of airborne poison. There was lay and expert testimony that Clark thought Flagstaff was populated with "aliens" (some impersonating government agents), the "aliens" were trying to kill him, and bullets were the only way to stop them. A psychiatrist testified that Clark was suffering from paranoid schizophrenia with delusions about "aliens" when he killed Officer Moritz, and he concluded that Clark was incapable of luring the officer or understanding right from wrong and that he was thus insane at the time of the killing. In rebuttal, a psychiatrist for the State gave his opinion that Clark's paranoid schizophrenia did not keep him from appreciating the wrongfulness of his conduct, as shown by his actions before and after the

shooting (such as circling the residential block with music blaring as if to lure the police to intervene, evading the police after the shooting, and hiding the gun).

*Id.*

At the conclusion of his trial, Clark renewed his motion for a directed verdict, which the court denied. On September 3, 2003, the court rejected Clark's insanity defense and found him guilty of first-degree murder. The court noted that the case "was well prepared and professionally tried," and that the "state and the defense were exceedingly well represented in this case." The court divided its verdict into two parts. First, it "f[ou]nd beyond a reasonable doubt that the defendant, Eric Clark, shot and caused the death of police officer, Jeff Moritz." Second, it noted that Clark had entered a plea of guilty but insane and it asked, (a) whether the defendant was "afflicted with a mental disease or defect," and—after concluding that he was—asked (b) if that "disease or defect caused him to not know his criminal act was wrong," as required by Arizona's moral incapacity test. The court concluded that Clark's schizophrenia "did not . . . distort his perception of reality so severely that he did not know his actions were wrong."

The court sentenced Clark to life in prison with possible release after twenty-five years.

B. *Direct Appeal and* Clark*'s Tripartite Framework*

On appeal to the Arizona intermediate appellate court, Clark argued "that it was not inconsistent with *Mott* to consider nonexpert evidence indicating mental illness on the

issue of mens rea, and [he] argued that the trial judge had failed to do so." The State responded that *Mott* barred "*any evidence* reflecting upon a mentally ill criminal defendant's ability to form the necessary *mens rea*."

In January 2005, the Arizona Court of Appeals affirmed Clark's conviction and sentence. While it noted that Clark had argued that the court erred in refusing to consider evidence of his mental disease or defect in determining whether he had the requisite mens rea to commit the murder, "the record shows that the trial court did not prevent Clark from presenting such evidence, despite our supreme court's decision to the contrary in *Mott*, even going so far as to permit him to make an offer of proof on the issue at the close of the evidence." However, "[a]side from the evidence offered to prove his insanity generally, Clark specified no evidence in his offer of proof that demonstrated he was not capable of knowing he was killing a police officer." The appellate court allowed that, "[e]ven assuming such evidence was sufficient, the trial court was bound by the [Arizona] supreme court's decision in *Mott*, which held that 'Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime.'" *Arizona v. Clark*, 1 CA-CR 03-0851; 1 CA-CR 03-0985 (Ariz. Ct. App. Jan. 25, 2005) (quoting *Mott*, 931 P.3d at 1051) The Arizona Supreme Court denied Clark's petition for review.

The U.S. Supreme Court granted certiorari to consider, first, "whether due process prohibits Arizona's use of an insanity test stated solely in terms of the capacity to tell whether an act charged as a crime was right or wrong," and, second, "whether Arizona violates due process in restricting consideration of defense evidence of mental illness and

incapacity to its bearing on a claim of insanity, thus eliminating its significance directly on the issue of the mental element of the crime charged (known in legal shorthand as the *mens rea*, or guilty mind)." *Clark*, 548 U.S. at 742. The Court held "there [was] no violation of due process in either instance" and affirmed the conviction. *Id.*

With regard to the second issue, which is at the heart of the instant appeal, the Court described three categories of evidence bearing on insanity: (1) "observation evidence," (2) "mental-disease evidence," and (3) "capacity evidence. *Id.* at 757–59.

It defined observation evidence as "testimony from those who observed what Clark did and heard what he said; this category would also include testimony that an expert witness might give about Clark's tendency to think in a certain way and his behavioral characteristics." *Id.* at 757. Such evidence could "support a professional diagnosis of mental disease and in any event is the kind of evidence that can be relevant to show what in fact was on Clark's mind when he fired the gun." *Id.* It "covers Clark's behavior at home and with friends, his expressions of belief around the time of the killing that 'aliens' were inhabiting the bodies of local people (including government agents), his driving around the neighborhood before the police arrived, and so on." *Id.* (footnote omitted). Observation evidence can be presented by "either lay or expert witnesses." *Id.* at 758.

Second, "mental-disease evidence" is "opinion testimony that Clark suffered from a mental disease with features described by the witness." *Id.* "As was true here, this evidence characteristically but not always comes from professional psychologists or psychiatrists who testify as

expert witnesses and base their opinions in part on examination of a defendant." *Id.* Such evidence at trial suggested Clark "fell within the category of schizophrenia." *Id.*

Third, "capacity evidence" refers to evidence of "a defendant's capacity for cognition and moral judgment (and ultimately also his capacity to form *mens rea*)." Such testimony can come from experts and focuses "on those specific details of the mental condition that make the difference between sanity and insanity under the Arizona definition." *Id.* The majority noted that these categories went to core differences, not the margins, and reserved decision on the "[e]xact limits" between them. *Id.* at 759.

After describing this taxonomy, the Court interpreted *Mott* differently than the Arizona Court of Appeals. It read *Mott* not as an absolute bar on all evidence of mental illness that could negate mens rea, as the Arizona appellate court had, but to bar only so-called mental disease and capacity evidence: "It is clear that *Mott* itself imposed no restriction on considering evidence of the first sort, the observation evidence." *Id.* at 760.

The Court faulted Clark's counsel for failing to recognize that *Mott* was so limited and for not preserving a claim that the trial court improperly excluded observation evidence. *Id.* at 764. But even on this central issue, the Court seemed to contradict itself. "In this case," the Court wrote, "the trial court seems to have applied the *Mott* restriction to all evidence offered by Clark for the purpose of showing what he called his inability to form the required *mens rea*." *Id.* at 760 (citation omitted). But that was not clear: "[T]he trial court's restriction may have covered not only mental-disease and

capacity evidence . . . but also observation evidence offered by lay (and expert) witnesses who described Clark's unusual behavior." *Id.* Later, the Court asserted more forcefully that "[a]t no point did the trial judge specify any particular evidence that he refused to consider on the *mens rea* issue." *Id.* at 763.

Finally, the Court concluded: "In sum, the trial court's ruling, with its uncertain edges, may have restricted observation evidence admissible on *mens rea* to the insanity defense alone, but we cannot be sure." *Id.* at 764–65. Nevertheless, it deemed a due process challenge to "a restriction of observation evidence . . . neither pressed nor passed" below, so it did not consider it. *Id.* at 765.[5] It went on to consider Clark's claim that his due process rights were violated by "Arizona's prohibition of diminished capacity evidence by criminal defendants"—not on observation evidence. *Id.* (internal quotation marks omitted). The court concluded that *Mott*'s (limited) restrictions were permissible. *Id.* at 770.

The three-part evidentiary categorization the Court created was a novel invention.[6] The dissent criticized it as a

---

[5] The dissent was more assertive, writing that the trial court's ruling and the terms of the verdict lead to the conclusion that the "most reasonable assumption, then would seem to be that the trial court did not consider [all evidence offered by Clark on his inability to form mens rea], and the Court does not hold otherwise." *Clark*, 548 U.S. at 784 (Kennedy, J., dissenting).

[6] *See* Susan D. Rozelle, *Fear and Loathing in Insanity Law: Explaining the Otherwise Inexplicable* Clark v. Arizona, 58 Case W. Res. L. Rev. 19, 44 (2007) ("[T]he Court's breakdown of relevant evidence into

"restructured evidentiary universe, with no convincing authority to support it" and claimed it was "unworkable on its own terms." *Id.* at 781 (Kennedy, J., dissenting). It criticized the Court for "refus[ing] to consider the key part of Clark's claim because his counsel did not predict the Court's own invention. It is unrealistic, and most unfair, to hold that Clark's counsel erred in failing to anticipate so novel an approach." *Id.* at 781–82.[7]

## C. *Post-Conviction Relief Proceedings*

### 1. State Court

In September 2006, Clark filed a petition for post-conviction relief in state court asserting five ineffective-assistance-of-counsel claims. The Arizona trial court denied all of Clark's claims. As pertinent to our review, it held that Clark's trial counsel was not ineffective when they did not raise the issue of competency after Clark had already been found competent. While Clark's counsel testified in a post-conviction hearing that he thought Clark may have been incompetent when he stopped drawing nonsensical symbols and appeared to sleep during part of the trial, the court held that "[m]inimal attorney competence does not place upon an

---

observational, mental-disease, and capacity categories has no basis in anything that has come before.").

[7] Justice Breyer's concurrence "agree[d] with the Court's basic categorization" but allowed that "the distinction among these kinds of evidence will be unclear in some cases." *Id.* at 780 (Breyer, J., concurring in part and dissenting in part). He favored remanding the case to the Arizona courts to "determine whether Arizona law, as set forth in *Mott* and other cases, is consistent with the distinction the Court draws and whether the trial court so applied Arizona law here." *Id.*

attorney a duty to rely on subjective personal opinions about a defendant's mental state, disregarding the opinions of numerous mental health experts." It also held that Middlebrook was not deficient for not seeking a competency reevaluation based on a test by one of Clark's psychiatrists that was of "questionable methodology."

The court additionally held that trial counsel was not ineffective for not preserving an observation evidence claim in light of the Supreme Court's disagreement on the issue. "Where arguably, three of the best legal minds in our country disagree with five others, finding that petitioner preserved his claim, this Court is hard pressed to find an ineffective assistance of counsel claim," it wrote. Because it held that Clark's counsel rendered adequate performance, the court did not address prejudice on either claim. The Arizona Court of Appeals and Arizona Supreme Court denied further review.

### 2. Federal District Court

In June 2009, Clark filed a federal habeas petition asserting the following grounds for relief: (1) there was insufficient evidence to support Clark's conviction for first-degree murder; (2) the trial court's conclusion that Clark was not insane at the time of the offense was unreasonable; (3) Clark's sentence constituted cruel and unusual punishment; (4) Clark was not competent to stand trial or waive his right to a jury trial; (5) Clark's trial counsel was ineffective for various reasons, including not preserving an "observation evidence" claim and not re-raising the issue of competency during trial; (6) the prosecutor engaged in misconduct by not advising the trial court of the need for a competency hearing regarding waiving a jury trial; and

(7) Clark's appellate counsel was ineffective for not raising a competency claim and an observational-evidence claim.

### a.  Magistrate Judge's Report and Recommendation

In November 2011, the magistrate judge issued a Report and Recommendation ("R&R") recommending that Clark be granted habeas release on his claim that his trial counsel rendered ineffective assistance of counsel by failing to preserve an observational evidence claim.  The R&R found that the remainder of Petitioner's claims were either procedurally defaulted or without merit.  The magistrate's R&R concluded that, even before the Supreme Court's decision in *Clark*, *Mott* did not exclude the entire field of evidence—expert psychological evidence, diminished capacity evidence, and what we now call observation evidence—and that Clark's counsel rendered deficient performance when they failed to recognize that and make an offer of proof, prejudicing Clark.

### b.  District Court Ruling

The district court disagreed with the R&R's resolution of the observation-evidence claim, and concluded that Clark's trial counsel was not ineffective for not preserving an observational-evidence claim, and, even if his counsel did render deficient performance, Clark failed to establish he was prejudiced.  The district court held that all the relevant evidence was admitted by the trial court, although perhaps not considered, and that there was no excluded evidence on which the counsel could have made an offer of proof. Furthermore, it held that Clark's counsel raised the mens rea issue "generally with the trial court, and then felt bound to abide by the trial court's ruling that he could not use this

evidence to negate *mens rea* other than to preserve the underlying evidence for appeal." Accordingly, the court found the performance of Clark's counsel adequate. And while it did not need to reach the prejudice prong, the court opined that Clark would have suffered no prejudice even if the evidence had been omitted in light of the State's overwhelming evidence establishing the requisite mens rea.[8]

Clark timely appealed.

## II.  STANDARDS OF REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, habeas relief can be granted only if the state court's proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). Under this "highly deferential standard," we "presume that 'state courts know and follow the law.'" *Lewis v. Lewis*, 321 F.3d 824, 829 (9th Cir. 2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Under § 2254, "[t]he pivotal question is whether the state court's application" of the Supreme Court precedent "was unreasonable[,]" *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011), as opposed to merely "incorrect or erroneous[,]"

---

[8] Although the district court held that a claim by Clark that his appellate counsel was ineffective was procedurally defaulted, the court addressed it out of an abundance of caution, finding that Clark's claim was meritless.

*Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). In applying this standard, we must give "state-court decisions . . . the benefit of the doubt," *Visciotti*, 537 U.S. at 24, and we will refrain from issuing a writ "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 786 (internal quotation marks and citation omitted).

Under § 2254(d)(2), the "unreasonable determination" clause, "a state-court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (internal quotation marks and citation omitted).

The "clearly established federal law" for ineffective assistance of counsel claims is articulated in *Strickland*. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). To succeed on a *Strickland* claim, a defendant must prove that (1) his counsel's performance was deficient in violation of the Sixth and Fourteenth Amendments, and (2) he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 687–88.

Counsel is constitutionally deficient if the representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687 (internal quotation marks and citation omitted). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential," and the

court must try not "to second-guess counsel's assistance after conviction." *Id.* at 689. When evaluating counsel's conduct, "we must make every effort 'to eliminate the distorting effects of hindsight, . . . and to evaluate the conduct from counsel's perspective at the time.'" *Gulbrandson v. Ryan*, 738 F.3d 976, 988 (9th Cir. 2013) (quoting *Strickland*, 466 U.S. at 689).

A defendant is prejudiced by counsel's deficient performance if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome" of a proceeding. *Id.* Thus, a petitioner need not prove "counsel's actions more likely than not altered the outcome," but rather he must demonstrate that "[t]he likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (internal quotation marks and citation omitted).

Because we are reviewing the Arizona courts' assessment of counsel's performance under AEDPA, our review is "doubly deferential." *Mirzayance*, 556 U.S. at 123. Subject to the constraints of *Strickland*, the Arizona courts must defer to counsel's judgment, and, subject to AEDPA's standards, we must defer to the Arizona courts' assessment of counsel's judgment. *See Titlow*, 134 S. Ct. at 13.

We review a district court's denial of a writ of habeas corpus *de novo*. *Dubria v. Smith*, 224 F.3d 995, 1000 (9th Cir. 2000).

### III.  DISCUSSION

The district court certified three issues for appeal: (1) whether "trial counsel was ineffective in failing to preserve the issue of observational evidence," (2) whether trial counsel was ineffective because the "defendant was not competent for the entire trial and trial counsel . . . failed to request a re-evaluation," and (3) whether "appellate counsel . . . was ineffective because he failed to raise the issue of competency in the appeal and failed to preserve the observational evidence at trial for appellate review and filed to this issue in the appeal."  We will consider each claim in turn.

### A.  *"Observation Evidence"*

On appeal, Clark relies on the U.S. Supreme Court's holding that his trial counsel did not preserve observation evidence as to mens rea.  *Clark*, 598 U.S. at 763.  Clark argues that reasonable counsel would have preserved the issue through an offer of proof when the trial court offered, and failing to do so prejudiced Clark.

The State argues that *Clark*'s tripartite evidence distinctions and its narrow interpretation of *Mott* created new law that Clark's counsel could not have reasonably been expected to anticipate.  Appellee's Opening Brief 14 (citing *Smith v. Murray*, 477 U.S. 527, 536 (1986)).  With regard to prejudice, the State argues that there was no evidence to suggest that Clark did not know the victim was a police officer, so even if observation evidence were considered on the subject of mens rea, Clark's claim would fail.

1. Ineffective Assistance

We conclude that it was not contrary to, nor an unreasonable application of, *Strickland* for the state court to determine that Clark's trial counsel did not provide ineffective assistance by failing to preserve explicitly the issue of observation evidence. *See Richter*, 131 S. Ct. at 786. First, it was unclear what evidence *Mott* excluded before the Supreme Court established the definitive interpretation in *Clark*. *Mott* concerned the testimony of an expert on BWS, but its language swept broadly: "Arizona does not allow *evidence* of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime." *Mott*, 931 P.2d at 1051 (first emphasis added). The Arizona Supreme Court wrote of "evidence," not merely expert evidence that could speak to a defendant's mental disorder, and it held that such evidence offered to "negate[] specific intent" was "not admissible for this purpose." *Id.* at 1054. Subsequent Arizona cases did not clarify the ambiguity. *See State v. McKeon*, 38 P.3d 1236, 1240 n.2 (Ariz. 2002) (distinguishing *Mott* on the ground that *Mott* concerned a mental disorder, unlike the involuntary intoxication defense at issue). Even the magistrate judge, who recommended granting the petition, noted that, "prior to *Clark* there was no jurisprudence holding that *Mott* was limited to expert testimony and did not include 'observational evidence.'" During Clark's direct appeal, the State argued that *Mott* barred "*any evidence* reflecting upon a mentally ill criminal defendant's ability to form the necessary *mens rea*," which was the interpretation the Arizona Court of Appeals adopted. Accordingly, as the Supreme Court itself debated, it was not clear before *Clark* whether *Mott* announced an "expansive rule of exclusion . . . without any suggestion of a limitation depending on the kind of evidence," or one

"limited to expert testimony." *Clark*, 548 U.S. at 786 (Kennedy, J., dissenting); *see id.* at 762 (majority opinion) ("[W]e understand that *Mott* is meant to confine to the insanity defense any consideration of characteristic behavior associated with mental disease.") (citations omitted).

In light of the ambiguities within *Mott* itself, the paucity of other relevant case law interpreting it, and the overlapping, inexact boundaries between the categories of observation, mental-disease, and capacity evidence within the Supreme Court's own formulation, *see id.* at 759, it was not an unreasonable application of *Strickland* for the state court to determine that Clark's trial counsel was not ineffective when it interpreted *Mott* more broadly than the Court did. Doing so did not fall "outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, especially where "'[a] fair assessment of attorney performance requires that every effort be made to . . . evaluate the conduct from counsel's perspective at the time.'" *Smith v. Murray*, 477 U.S. 527, 536 (1986) (first alteration in original) (quoting *Strickland*, 466 U.S. at 689). That is all the more true here, since "[w]e do not expect counsel to be prescient about the direction the law will take." *Hoffman v. Arave*, 455 F.3d 926, 940 (9th Cir. 2006), *vacated in part on other grounds*, 552 U.S. 117, 128 (2008) (per curiam); *see also Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (holding that a lawyer is not ineffective for failing to anticipate a decision in a later case).

Second, while the U.S. Supreme Court and the Arizona Court of Appeals referred to Clark's counsel's failure to make an offer of proof, the record shows that all of the evidence that could have negated Clark's mens rea was admitted and it is, at best, unclear what evidence the trial court considered

and what it excluded. With regard to evidence of Clark's delusions, the trial court said it was bound by *Mott* and would focus on the evidence's relevance to the insanity defense, but it would let counsel "get all that stuff in because it goes to the insanity issue and because [the trial was] not in front of a jury." Middlebrook, one of Clark's trial lawyers, later said that, following the court's ruling on the *Mott* issues, he thought he "had preserved" the issue of "being able to bring in lay people to discuss mens rea and, in effect, to negate [Clark's] ability to premeditate and/or perceive that Officer Moritz was in fact a police officer versus an alien." And, during trial, Clark presented significant evidence from expert and lay witnesses who spoke of Clark's odd behaviors and his expressed beliefs that aliens were taking the form of government agents in Flagstaff. Clark's trial counsel believed that they had introduced "all the evidence" that they thought was needed. "It wasn't like we left out a piece of evidence," Middlebrook later said.

In *Clark*, the U.S. Supreme Court noted that the trial judge did not "specify any particular evidence that he refused to consider on the *mens rea* issue." *Clark*, 548 U.S. at 763. And, while holding that Clark's counsel did not preserve the observation evidence claim, the Court hedged, concluding that the trial court "*may* have restricted observation evidence admissible on *mens rea* to the insanity defense alone, but we cannot be sure." *Id.* at 764–65 (first emphasis added).

And if the Supreme Court itself was uncertain what the state court had considered, it was not deficient performance for Clark's counsel to believe that the state court had considered all of the relevant evidence going to Clark's mens rea consistent with the then-prevailing interpretation of *Mott*. *See Bell v. Cone*, 543 U.S. 447, 455 (2005) ("We do not think

that a federal court can presume so lightly that a state court failed to apply its own law."); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) ("Trial judges are presumed to know the law and to apply it in making their decisions."), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). Accordingly, we hold that the state court did not unreasonably apply *Strickland* when it held that Clark's trial counsel did not fall below an objective standard of reasonableness. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *see also Mancuso v. Olivarez*, 292 F.3d 939, 954 (9th Cir. 2002) ("We will not second-guess such decisions or use hindsight to reconstruct the circumstances of counsel's challenged conduct.").

### 2. Prejudice

Because a defendant must show both that his counsel was deficient and that he was prejudiced by the counsel's actions, our finding on performance would end our analysis. *See Murtishaw v. Woodford*, 255 F.3d 926, 940 (9th Cir. 2001). However, even if Clark could show that the trial court did not consider observation evidence, he cannot show that he was prejudiced because he cannot show that there was a "substantial, not just conceivable" likelihood of a different result if the court had considered such evidence. *Richter*, 131 S. Ct. at 792.

Since "the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo.*" *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (internal citation omitted).

"[I]n order to determine whether counsel's errors prejudiced the outcome of the trial, 'it is essential to compare

the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently.'" *Murtishaw*, 255 F.3d at 940 (quoting *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995)). In the instant case, the state presented substantial evidence that Clark had the required mens rea—of "knowing[ly] . . . caus[ing] the death of a law enforcement officer." Ariz. Rev. Stat. Ann. § 13-1105(A)(3). Specifically, the state presented evidence of: Clark's professed anger toward the police and his fantasies of retaliating against them; his efforts to attract a police officer the night of the killing by circling a residential block with loud music blaring; the use of a weapon at close range from behind, showing an intent to kill; Clark's recognition of and response to police indicia (i.e., Mortiz wore a uniform and Clark pulled over in response to emergency lights and sirens); and Clark's flight from the scene and attempt to dispose of the murder weapon.

The magistrate judge wrote that such evidence was "not inconsistent with a paranoid delusion that the officer was an alien intent on killing him. . . . A malevolent alien in a police uniform, driving a squad car with lights and sirens, is still a malevolent alien." Such conclusions draw us too deeply into the shadowy details of Clark's hallucinations. The statute requires proving that Clark intentionally or knowingly killed a police officer—that Clark might have thought the officer was possessed by an alien does not otherwise negate the mens rea needed to violate the statute. And, more to the point, the substantial evidence the State presented that showed Clark's intent to kill a police officer, regardless of whether Clark believed that the police officer was otherwise possessed, means that Clark cannot show, as he must, "that there is a reasonable probability that, but for counsel's unprofessional errors," if they occurred, "the result of the proceeding would

have been different." *Strickland*, 466 U.S. at 694. Accordingly, because we conclude that the result of the proceeding would not have been different even if Clark's counsel's was deficient, Clark was not prejudiced. *See Hurles v. Ryan*, 752 F.3d 768, 782 (9th Cir. 2014) (holding petitioner did not establish prejudice even where counsel's performance likely proved deficient).

B. *Competency During Trial*

A defendant is deemed competent to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and . . . has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (internal quotation marks omitted). Once a defendant is deemed competent and a trial has begun, a trial court must "sua sponte inquire into a defendant's competency if a reasonable judge would be expected to have a *bona fide* doubt as to the defendant's competence. A bona fide doubt exists if there is substantial evidence of incompetence." *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 489 (9th Cir. 1997) (internal citations and quotation marks omitted), *overruled on other grounds by United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014) (en banc). We have recognized a high bar for what constitutes a "bona fide doubt" of competence. *See Williams v. Woodford*, 384 F.3d 567, 606 (9th Cir. 2002) ("[T]here is no constitutional prohibition against the trial and conviction of a defendant who fails to pay attention in court—whether out of indifference, fear, confusion, boredom, or sleepiness—unless that defendant cannot understand the nature of the proceedings against him or adequately assist counsel in conducting a defense.") (internal citation and quotation marks omitted); *de Kaplany v. Enomoto*, 540 F.2d

975, 978–79 (9th Cir. 1976) (holding counsel was not ineffective when he did not seek a hearing on defendant's competency where defendant made isolated outburst and psychiatric testimony characterized him as "severely disturbed").

### 1.  Ineffective Assistance

On appeal, Clark argues that his counsel was ineffective for failing to call for another competency hearing after Middlebrook noticed Clark did not seem to be paying attention.  Clark points to two pieces of evidence to support his contention.  First, he argues that while the state court deemed him competent to stand trial in May 2003, his expert, Dr. Susan Parrish, issued another report in July 2003, shortly before the start of trial, in which she reiterated her concerns that Clark was incompetent.  Second, Middlebrook testified during the state post-conviction relief proceedings that he knew Clark was taking his Haldol injections but not taking a second medication called Cogentin and that he noticed Clark was not scribbling nonsensically as often as he used to and was putting his head on the counsel's table.  Middlebrook further testified that he believed a reasonable attorney would have requested Clark's reevaluation.

The State argues that Dr. Parrish had never believed Clark was competent and her July report did not address whether Clark's lack of cooperation with his lawyers was volitional. It criticizes the test Parrish administered, referred to as the MacCAT-CA, as irrelevant, since only one part of the test—the "understanding section"—is relevant to whether a defendant understands the proceedings.  It also argues that Middlebrook's after-the-fact personal impressions are insufficient to demonstrate ineffective assistance.

The State has the better of the argument here. First, as the Arizona court pointed out, "[f]rom the beginning Dr. Parrish never found [Clark] competent," and thus her July 2003 report "was completely consistent with her opinion known to all parties." Three mental health experts—Drs. DiBacco, Kassell, and Jasinski—had disagreed with Dr. Parrish, and the trial court had found Clark competent. It was not ineffective for "Mr. Middlebrook [to have] relied on the experts' opinions even though personally he disagreed with them and proceeded to trial."

Moreover, Dr. Parrish's July 2003 report was inconclusive. Dr. Parrish found that "Clark's scores with regard to a factual understanding of the legal proceedings associated with adjudication placed him in the bottom 20% of defendants considered competent and slightly above the mean for defendants who were confirmed to be incompetent." His score "placed him on the borderline between Minimal or no impairment and Mild impairment." And, the Arizona court found that even though Middlebrook thought Clark was not competent to stand trial, counsel later admitted that Clark "was competent at least early on in the beginning of trial."

Second, Middlebrook was not ineffective because he acted on his concern for Clark's mental health when he told the court he had doubts that Clark was receiving his medication. The court said it would contact the jail to make sure they were aware of a court order requiring he be given his injections, even if involuntarily. After-the-fact second-guessing about what Middlebrook should have done without "substantial evidence" of incompetence is not required, *Amaya-Ruiz*, 121 F.3d at 489, and does not comport with *Strickland*'s restriction on adjudicating by hindsight. *Strickland*, 466 U.S. at 689; *see also Edwards v. Lamarque*,

475 F.3d 1121, 1125 (9th Cir. 2007) (en banc) ("The trial court need not accept a self-proclaimed assertion by trial counsel that trial counsel's performance was inadequate.").

## 2. Prejudice

With regard to prejudice,[9] to succeed, Clark has to show not only that the trial court would have ordered a reevaluation, but also that there was "a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully considered." *Stanley v. Cullen*, 633 F.3d 852, 862 (9th Cir. 2011) (quoting *Jermyn v. Horn*, 266 F.3d 257, 283 (3d Cir. 2001)); *see also Strickland*, 466 U.S. at 696. In light of the lengthy competency process, the reports of several doctors attesting to Clark's competence, the absence of any new information in Dr. Parrish's July 2003 report, and the judge's order that Clark be forcibly medicated, it is not reasonably probable that the trial court would have granted a second competency hearing and deemed Clark incompetent. *See Hibbler v. Benedetti*, 693 F.3d 1140, 1150 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 1262 (2013); *Stanley*, 633 F.3d at 863; *see also Jermyn*, 266 F.3d at 287 (holding there was no reasonable probability court would have found defendant insane). Accordingly, it was not contrary to, nor an unreasonable application of, *Strickland* for the state court to determine that Clark's trial counsel was not ineffective when they did not request a reevaluation of Clark's competency during trial.

---

[9] We address the prejudice prong *de novo* since the state court did not reach it. *See Rompilla*, 545 U.S. at 390.

C.  *Appellate Counsel*

Clark argues that his appellate counsel was ineffective for not raising the observation evidence or competency claims on appeal.

The magistrate judge concluded that Clark did not fairly present a federal claim that his appellate counsel was ineffective, and that the claim was procedurally defaulted because it was too late to return to the Arizona courts to raise the claim.  The district court adopted the magistrate judge's conclusion but also disposed of the claim on the merits, in the alternative, in the event that a Supreme Court case then pending—ultimately decided as *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)—would materially change the law.

Clark did not contest the district court's ruling on procedural default in his opening brief.  "We review only issues which are argued specifically and distinctly in a party's opening brief."  *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994).  Accordingly, we deem Clark's claim of ineffective assistance of appellate counsel abandoned because he "d[id] not adequately raise this point in his appeal."  *Smith v. Idaho*, 392 F.3d 350, 356 n.7 (9th Cir. 2004).[10]

---

[10] *Martinez* established that, if, under state law, "claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."  132 S. Ct. at 1320.  It does not excuse Clark's failure to brief the issue of procedural default on appeal.

## IV.  CONCLUSION

We conclude that it was not contrary to, nor an unreasonable application of, *Strickland* for the state court to determine that Clark's trial counsel did not provide ineffective assistance by failing to preserve explicitly the issue of observation evidence or by failing to request a reevaluation of Clark's competency during trial.  We also hold that Clark's claim of ineffective appellate counsel is procedurally defaulted.  Accordingly, the district court's order is

**AFFIRMED**.